## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| **MICHAEL IRVIN,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| | § | **CIVIL ACTION NO. 4:23-cv-131** |
| **MARRIOTT INTERNATIONAL, INC.** | § | |
| | § | |
| **Defendant.** | § | |
| | § | |
| | § | |

## DEFENDANT MARRIOTT INTERNATIONAL, INC.'S MOTION FOR PROTECTIVE ORDER AND TO LIMIT PRETRIAL PUBLICITY

### I.      INTRODUCTION

In Plaintiff Michael Irvin's latest attempt to feed the media frenzy he created, he and his counsel held a livestreamed press conference on March 8, 2023, in which they made inflammatory, materially prejudicial statements about the evidence in this case.  For example, during the press conference, Irvin's counsel provided a self-serving, inaccurate summary of the video footage Marriott produced, including his claim that the footage *proves* Irvin did nothing wrong, and then turned the microphone over to Irvin to make racially charged statements. Contrary to Irvin's and his counsel's public statements, the facts will ultimately show that Irvin made unwelcome sexual advances against a female employee of the Renaissance Phoenix Downtown Hotel (the "Hotel"), an employee (the "Victim") who did not know who Irvin was and who, in reporting his despicable behavior, sought nothing more than to be free from further harassment.  Similarly, the facts will also show that the Hotel did nothing more than follow (1) its normal steps for investigating and addressing reports of sexual harassment by guests and

(2) the National Football League's (the "NFL") express direction to notify it in the event of any incidents involving its personnel staying at the hotel.  In short, the evidence will show that Marriott, the Hotel, and the Victim did **_nothing_** wrong and certainly did not defame Irvin or interfere with his NFL contract.

In the interim, however, the Court should take swift action to ensure that Irvin and his counsel do not jeopardize the safety and privacy of the Victim, the Hotel's employees, and its guests, or further prejudice Marriott's right to a fair trial with additional inflammatory publications of (and misleading commentary on) the evidence in this case.  To accomplish this, the Court should prohibit Irvin from publicly disclosing any video recordings and from using such videos for any purpose other than litigating this case.  Further, in accordance with the applicable ethical rules, the Court should prohibit Irvin's counsel, directly or by proxy, from further commenting on or characterizing the evidence in this case.[1]

## II.    RELEVANT FACTUAL BACKGROUND

Given Irvin's false narrative regarding the events of February 5–6, 2023, Marriott provides the Court with the following summary of the key facts it has learned from the Hotel since Irvin filed this action.[2]

---

[1] For the reasons set forth in its pending motion to dismiss for lack of personal jurisdiction, Marriott objects to any further proceedings in this Court and requests that this case be dismissed or, alternatively, transferred to the District of Arizona where it belongs.

[2] The following description of the facts is based on information Marriott has obtained from the Hotel and its employees during its preliminary investigation, which is ongoing.  Marriott reserves the right to amend, supplement, or modify its statements as additional facts are ascertained, analyses are made, and the contentions of the parties become apparent.

**A.      The National Football League Arranges for Irvin to Stay at the Hotel.**

Pursuant to a contract between the Hotel and the NFL for Super Bowl LVII lodging, the NFL booked rooms for Irvin and other NFL-affiliated personnel at the Hotel.  On February 4, 2023, the NFL directed the Hotel to contact its liaison for the group if there were any incidents at the Hotel involving the guests staying in its block of rooms.

**B.      Irvin Becomes Intoxicated and Sexually Harasses the Victim.**

Irvin arrived at the Hotel on February 5, 2023.  That evening, he returned to the Hotel after dinner and drinks and appeared to be visibly intoxicated in the Hotel bar, the Dust Cutter.  Later in the evening, near the end of her shift, the Victim walked from the back of the house toward the Dust Cutter in the course of her normal duties.  As the Victim entered the Dust Cutter, Irvin flagged her down and the two stepped into the Hotel lobby.  Irvin shook her hand, asked if she worked there, and what she did there.  The Victim confirmed that she worked there and asked if she could help Irvin with anything.  Irvin then stated that she was attractive and reached out to shake her hand, asked her name and introduced himself as "Michael."  Irvin then asked whether she watched football, to which the Victim responded that she did not, and Irvin told her she should look him up on the internet sometime.  Irvin also reached out and touched the Victim's arm during this conversation without her consent, causing her to step back, becoming visibly uncomfortable.

Irvin then asked the Victim whether she knew anything about having a "big Black man inside of [her]."  Taken aback by Irvin's comments, the Victim responded that his comments were inappropriate, and she did not wish to discuss it further.  Irvin then attempted to grab the Victim's hand again and said he was "sorry if he brought up bad memories" for her.  The Victim pulled her hand away and tried to back away from Irvin as he continued to move towards her.

During this interaction, two other Hotel employees noticed that the Victim had a look of concern on her face and began moving toward Irvin and the Victim, prompting Irvin to state that "security" had noticed him and extend his hand for another handshake.  Seeing that other Hotel employees were in the area and wanting the interaction to end, the Victim returned Irvin's handshake.  Irvin then stated that he would come back to find her sometime that week when she was working.  The Victim then left the interaction to assist another employee who was waiting for her in the Dust Cutter with Irvin leering at her as she walked away.

As the Victim was walking away, another employee ("Employee 1") who had assisted Irvin earlier in the day walked over to Irvin.  After Irvin finished leering at the Victim and turned back to Employee 1, he said aloud "she bad," "she bad," "I want to hit that," and slapped himself in the face three times, saying "keep it together Mike."  Employee 1 observed that Irvin was slurring his words and acting like he was under the influence.

After slapping himself, Irvin pivoted and said to Employee 1, "let's go take a picture over there," referring to another area of the Hotel lobby.  Employee 1 agreed, snapped one photo of the two of them, shook hands with Irvin, and assisted him with finding the elevator.  Irvin entered the elevator and, to the Hotel's knowledge, went about his business the following day.

**C.   The Victim Reports the Harassment to Coworkers and Management.**

Following her interaction with Irvin, the Victim reported his comments to another Hotel employee ("Employee 2"), who noticed that she appeared visibly shaken by the event, and finished what little remained of her shift.  As soon as she arrived at work the next day, February 6, 2023, the Victim reported Irvin's comments to her manager and expressed concern that she would have to continue to see Irvin that week.

The Victim's manager advised her that she needed to report the incident to the Hotel's Loss Prevention department and escorted her there to make a report.  The Victim gave a short, handwritten statement recounting Irvin's comments to Loss Prevention, which escalated the matter to the Hotel's Director of Operations, who interviewed the Victim.

**D.      The Hotel Informs the NFL of the Incident and Continues Its Investigation.**

Following his interview of the Victim, pursuant to the NFL's prior direction, the Hotel's Director of Operations contacted the NFL's designated point of contact to advise that they had received a report that one of the NFL's guests had made sexually harassing remarks to a female employee.  The NFL's point of contact responded that someone else would contact the Director of Operations to follow up.

The Director of Operations then worked with the Hotel's Loss Prevention department to pull the relevant video footage and reviewed it.  After reviewing the video footage, he concluded that the video was consistent with the Victim's report that the interaction was inappropriate. Further, based on the Victim's statement, the video footage, and Irvin's statement that he would come back to find the Victim later during his stay, the Director of Operations concluded that Irvin posed a potential safety risk to the Victim and other employees.  After further discussion with the Hotel's general manager and other security personnel, the Hotel believed that Irvin should leave the premises, especially given his statement that he would come back to find the Victim.  However, the hotel took no further action pending the NFL's investigation.

**E.      The NFL Interviews the Victim and Reviews the Video Footage.**

Shortly thereafter, early in the evening of February 6, 2023, the NFL sent its investigator to the Hotel and asked if the Victim was willing to speak with her.  The Victim agreed to the interview and repeated her account of her interaction with Irvin.  The NFL investigator then asked to review the video and the Hotel allowed her to do so.  Following her review of the video,

the NFL investigator escalated the matter and additional NFL personnel quickly arrived at the Hotel.

Thereafter, the NFL handled all communications with Irvin, including the need for him to leave the property.  At no point did Hotel security or anyone else affiliated with the Hotel wake Irvin up or remove him from the Hotel.  Rather, Irvin arrived in the lobby at approximately 10 pm that same evening, alone and fully dressed in a suit and tie with his suitcase packed.  Two NFL representatives then walked out of the Hotel with Irvin where a chauffeured vehicle was waiting for him.  Irvin left the Hotel without further incident.

**F.      Irvin Initiates a Media Circus and Files the Instant Lawsuit.**

After Irvin departed from the Hotel, the NFL stated that Irvin would not be part of the Super Bowl LVII coverage.  *Irvin pulled from NFL Network's Super Bowl*, Associated Press, (Feb. 8, 2023), https://txed.uscourts.gov/location/paul-brown-courthouse-sherman-division ("'Michael Irvin will not be part of NFL Network's Super Bowl LVII week coverage,' NFL Network spokesman Alex Riethmiller said.").   On or about February 9, 2023, Irvin began speaking with the media, admitting that he had been drinking and could not remember the interaction with the Victim, and stating that his ***only*** physical contact with the Victim was a handshake.  Josh Clark, *Michael Irvin address incident that got him removed from NFL Network's Super Bowl coverage*, Audacy, (Feb. 8, 2023, 2:57 PM), https://www.audacy.com/ national/sports/michael-irvin-speaks-on-incident-involving-woman-at-hotel   ("I   don't   even remember it really because I had a few drinks to tell you the truth."); Jason Hahn, *Michael Irvin Pulled from NFL Network's Super Bowl Coverage After Complaint from Woman* (Feb. 9, 2023 04:56   PM),   https://people.com/sports/michael-irvin-pulled-from-nfl-networks-super-bowl-

coverage/ ("In an interview with the *Dallas Morning News*, 56-year-old Irvin insisted the encounter with the woman was brief, public and mostly non-physical outside of a handshake.").

Although neither the Hotel nor Marriott had any involvement in the NFL's analysis of Irvin's behavior or its decisions with respect to his work for the NFL, Irvin filed this action against Marriott for defamation and tortious interference, seeking $100 million in damages.  DE 3 at 4–6.  Since filing this action, Irvin and his counsel continued to publicize the litigation and mischaracterize Marriott's decision to protect the privacy of the Victim, its guests, and its employees by not publicly releasing the video footage as proof that the video exonerates him. *See, e.g.*, Mike Florio, *Michael Irvin's lawyer is "mad as hell" that Marriott refuses to produce surveillance video*, NBCSports (Feb. 22, 2023, 12:59 AM EST), https:// profootballtalk.nbcsports.com/2023/02/22/michael-irvins-lawyer-is-mad-as-hell-that-marriott-refuses-to-produce-surveillance-video/; Steven Rosenbaum & Caroline Vandergriff, *Miichael Irvin calls misconduct allegations 'nonsense,' asks for surveillance video of incident*, CBS Texas (Mar. 8, 2023).

## G.     The Hotel Receives Threats, Improper Inquiries, and Derogatory Comments.

After Irvin left the Hotel on February 6, 2023, the Hotel began receiving threatening phone calls, voicemails, and in-person inquiries regarding the video footage and the Victim's identity.  (Declaration of Tracy Stoltz ("Stoltz Decl.") ¶ 3.)  For example, the Hotel received a call from an unknown individual seeking information about its security protocols, a voicemail regarding the Hotel burning down, a phone call threatening a public protest at the Hotel, and other inquiries from third parties at the front desk demanding to see the video footage.  (Stoltz Decl. ¶ 4.) The Hotel also received a battery of threatening and derogatory comments on its Google account and other social media outlets.  (Stoltz Decl. ¶ 5.)

**H.      Irvin's Latest Press Conference Necessitates This Motion.**

On March 3, 2023, Irvin and his counsel held a public, livestreamed press conference for the express purpose of making extrajudicial statements about the evidence including, for example, his counsel's mischaracterization of the video footage as follows:

- Claiming that the video does not show whether Irvin or the Victim spoke to the other first;

- Claiming that the Victim never acts upset, does not back away from Irvin, or act if there are any problems;

- Claiming that the Hotel woke Irvin up in the middle of the night and asked him to leave without explanation; and

- Claiming that Marriott, which has taken reasonable steps to protect the privacy of the Victim, the Hotel employees, and the Hotel guests by ***not*** publicly releasing the video, is trying use the video to destroy Irvin.

*See* CBS Texas, *Michael Irvin calls allegations "nonsense' in emotional press conference*, YouTube (Mar. 8, 2023), https://www.youtube.com/watch?v=f667tkv15Mk.  Setting aside the fact that Irvin's counsel's representations regarding what the video shows will be proven false, his decision to publicly comment on core evidence in this case necessitated this motion.

Marriott's counsel conferred with Irvin's counsel on March 9, 2023 regarding this motion and Marriott's proposal to resolve Irvin's pending motion to obtain a copy of the video with a reasonable protective order.  (Declaration of Nathan D. Chapman ("Chapman Decl.") ¶¶ 2–3 & Ex. A.)  Irvin's counsel refused to agree to the proposed protective order or to the relief sought herein.  (*Id.*)

### III.    ARGUMENT

**A.    A Protective Order is Necessary to Protect the Privacy and Safety of the Hotel Employees and Guests Visible in the Video.**

Under Federal Rule of Civil Procedure 26(c), the Court may, "for good cause," issue a protective order to protect a party "from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c).  While "[a] party may generally do what it wants with material obtained through the discovery process," if the party from whom discovery is sought shows "good cause," as contemplated by Rule 26(c), "the presumption of free use dissipates, and the district court can exercise its sound discretion to restrict what materials are obtainable, how they can be obtained, and what use can be made of them once obtained."  *Harris v. Amoco Prod. Co.*, 768 F.2d 669, 683–84 (5th Cir. 1985).  In general, "in determining whether to grant a protective order, the court must balance the requesting party's need for the information against the injury that might result if uncontrolled disclosure is compelled."  *Gutierrez v. Benavides*, 292 F.R.D. 401, 404 (S.D. Tex. 2013) (citing *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 785 (3d Cir. 1994)).

Here, Irvin has repeatedly confirmed that if he obtains a copy of the video recording in question, he will disseminate it to third parties, including media outlets.  *See* DE 5 (Irvin's Motion for Expedited Discovery) at 3 (requesting security footage "so that he, the NFL, ***and anyone else interested in the truth***, will be able to witness [Irvin's] conduct" (emphasis added)); DE 17 at 3 (arguing Irvin needs a copy of the video to "prove his innocence to his employers ***and fans***" despite the NFL having already viewed the video footage and interviewed the Victim (emphasis added)).  In fact, during the conferral regarding this motion, Irvin's counsel confirmed that he would not agree to a proposed protective order that would guard against the public disclosure of the images of the Hotel's employees and guests.  (Chapman Decl. ¶ 4 & Ex. A.)

Thus, in the absence of a protective order, the video will be publicly and widely disseminated to the detriment of innocent third parties.

As Marriott explained in its response to Irvin's Motion to Enforce Court Order, Marriott's preeminent concern around providing the video recordings to Irvin and his counsel is and has been the safety and privacy of its employees and guests, several of whom appear on the video and whose interests may be compromised by public disclosure of the video.  DE 19 at 2. The Court has already recognized that Marriott's privacy concerns are "well founded."  DE 15 at 4.  To be sure, the Court has permitted Marriott to "take reasonable measures to protect the employee's identity as necessary."  *Id.*  But given the high-profile nature of this case and media frenzy surrounding it (which Irvin and his counsel have created), there remains a significant risk that Irvin's fans or others who wish the Victim or the Hotel ill will use this information to identify the Victim by any means necessary.  Moreover, Marriott's reasonable efforts to protect the Victim's privacy at this stage do not protect the identity of other members of Hotel staff and guests who are also visible in the video and may be identified by individuals seeking information about this case or to influence its outcome or perpetuate harm.

The concerns here are not limited to the "privacy" concerns the Court has already recognized.  As Marriott has already noted, should the Victim or any other member of Hotel staff be identified by members of the public, their physical safety may be at risk.  The Hotel has already received threatening voicemails (including one regarding the Hotel burning down), phone calls, and unwarranted in-person demands for copies of the video footage and the Victim's identity.

Accordingly, good cause exists here to enter a protective order to prevent this dissemination.  *See Partin v. Wal-Mart Louisiana, LLC*, No. 09-2229, 2011 WL 441474, at *1

(Feb. 1, 2011) (affirming magistrate judge order issuing a protective order preventing public dissemination of video evidence because "[w]ithout such a protective order, [plaintiff] could— and most likely will—release the Video to local media outlets").

Indeed, Irvin has already admitted that Marriott's guest and employee privacy concerns can be addressed by "a standard form protective order *that restricts disclosure of video*," DE 17 at 4, though Irvin's counsel has refused to stipulate to such an order (and for days rebuffed Marriott's counsel's efforts even to confer on the subject). *See* DE 19-3; DE 19-4 (documenting Marriott's requests to confer on a stipulated protective order that would permit Marriott to provide Irvin with a copy of the video).

## B.      The Court's Order Should Limit Pretrial Publicity in This Case.

On March 8, Irvin and his counsel held a press conference where they made inflammatory (and often false) claims about the evidence in this case and what it purports to show.  Most notably, Irvin's counsel publicly described the video evidence that Marriott produced to assert that the video *proves* Irvin did nothing untoward, characterizing the Victim's report of Irvin's misconduct as "nonsense" and misrepresenting various aspects of the video in the process.  Of course, as Irvin's counsel is well aware, the Victim's complaint about Irvin concerned inappropriate, harassing, and explicitly sexual *comments* that Irvin allegedly made to her, including his promise to come back and find her later in the week.  In this regard, Irvin's continued public insistence that he does not know what he has been accused of doing is patently false.  Pursuant to this Court's March 1, 2023 Order, Marriott has already provided Irvin's counsel with copies of the non-privileged reports and witness statements (including the Victim's written statements identifying Irvin's harassing comments).  DE 18.  Predictably, neither Irvin nor his counsel mentioned these documents in their press conference.

Both Irvin's counsel's own statements and those they permitted Irvin to make confirm that an order limiting all counsel's ability to publicly comment on the evidence in this case and what it does (or does not) show is necessary and appropriate.  For example, Irvin's press conference raises serious concerns about his counsel's willingness to comply with the standards of practice laid out in this Court's Local Rules (and the ethical rules referenced therein) with respect to pretrial publicity.  The Local Rules provide that an attorney practicing before this Court "should be familiar with the duties and obligations imposed upon members of this bar by the Texas Disciplinary Rules of Professional Conduct."  L.R. AT-2(a).  Those Rules in turn provide that "a lawyer ***shall not make***," or "counsel or assist another person to make," any "extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication if the lawyer knows or reasonably should know that it will have a ***substantial likelihood of materially prejudicing an adjudicatory proceeding***."   Tex. Disciplinary Rules of Prof'l Conduct., R. 3.07(a) (emphasis added).  The Rules further specifically state that "[a] lawyer ordinarily will violate" this rule "when the statement refers to . . . ***the identity or nature of physical evidence expected to be presented***."  *Id..* R. 3.07(b)(3) (emphasis added).

The Local Rules also encourage counsel to adhere to the Codes of Pretrial and Trial Conduct promulgated by the American College of Trial Lawyers, which are available through the Court's website, and which provide that "[a] case should be tried in the courtroom and not in the media" and that "***a lawyer should not make any extrajudicial statement that may prejudice an adjudicative proceeding***."  *See* American College of Trial Lawyers, *Code of Pretrial and Trial Conduct* at p. 12, *available at* https://txed.uscourts.gov/sites/default/files/HR_Docs/pretrial _and_trial_conduct.pdf (last visited March 9, 2023) (emphasis added).  These rules serve an

important purpose and are "premised on the idea that preserving the right to a fair trial necessarily entails some curtailment of the information that may be disseminated about a party prior to trial."  Tex. Disciplinary Rules of Prof'l Conduct, Comment 1 to R. 3.07.

Irvin's counsel's statements (and any statements they may have "counsel[ed] or assist[ed]" Irvin to make) have not only created a "likelihood of materially prejudicing" this proceeding, they appear expressly *calculated* to do so.  Indeed, Irvin's counsel's public comments to date appear designed not to inform the public about the status of this case, but to convince the public (including potential jurors) that the evidence definitively shows that Irvin did not engage in the harassment the Victim reported to the Hotel and that his claims against Marriott are therefore meritorious.  This is precisely the outcome the Texas Disciplinary Rules seek to avoid.  Thus, it would be extremely prejudicial to permit Irvin and his counsel to continue to taint the potential jury pool through and otherwise prejudice Marriott's right to a fair trial by continuing the public sideshow he has created.  This is especially true considering Marriott's strict adherence to the principles embodied in the ethical rules discussed above and its refusal to litigate Irvin's claims against it in public instead of the courtroom.

Marriott acknowledges and respects that the Court must consider countervailing interests of the parties and the public, but it must balance those interests with the need to conduct this litigation "free from the type of pretrial publicity that might hinder jury selection and the fair trial of this case."  *In re Norplant Contraceptive Prod. Liab. Litig.*, No. MDL 1038, 1996 WL 631729, at *1 (E.D. Tex. Oct. 28, 1996) (ordering the parties to submit proposed "orders prohibiting either side from publicly commenting on this litigation or engaging in any kind of public relations effort until completion").

Under these circumstances, the Court should enter an order appropriately restricting all counsel in this action from making public statements concerning the evidence or from publicly opining on what that evidence does or does not show.

## IV. CONCLUSION

For the reasons shown above, Marriott respectfully requests that the Court enter a protective order (1) prohibiting the public disclosure of any video recordings produced to date or pursuant to any further Court orders and (2) barring all counsel from making extrajudicial statements regarding the evidence in this case and what it does or does not show.

Dated: March 10, 2023.

Respectfully submitted

/s/ *Nathan D. Chapman*
Nathan D. Chapman (*pro hac vice*)
nchapman@kcozlaw.com
C. Celeste Creswell (*pro hac vice*)
ccreswell@kcozlaw.com
KABAT CHAPMAN & OZMER LLP
171 17th Street, NW, Suite 1550
Atlanta, Georgia 30363
Tel: (404) 400-7300
Fax: (404) 400-7333

Kendall Kelly Hayden (SBN) 24046197
khayden@cozen.com
Tyler M. Frankel (SBN 24101767)
tfrankel@cozen.com
COZEN O'CONNOR
1717 Main Street, Suite 3400
Dallas, Texas  75201
Telephone: (214) 462-3000
Facsimile:  (214) 462-3299

*Attorneys for Marriott International, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 10th day of March, 2023, a true and correct copy of the above and foregoing was served via CM/ECF system to the all counsel of record.

*/s/ Nathan D. Chapman*
Nathan D. Chapman

## <u>CERTIFICATE OF CONFERENCE</u>

Pursuant to Local Rule CV-7(i) I hereby certify that I conferred with counsel for Plaintiff as required by Local Rule CV-7(h) in an effort to resolve the issues raised in this motion and have been unable to do so.  Specifically, the I and my partner, C. Celeste Creswell, conferred telephonically with Plaintiff's counsel, Levi McCathern, on March 9, 2023.  Mr. McCathern refused to agree to the entry of a stipulated protective order or to the relief sought in the motion. (Chapman Decl. ¶ 3.)  Accordingly, the parties' discussions have reached an impasse, leaving an open issue for the Court to resolve.

*/s/ Nathan D. Chapman*
Nathan D. Chapman
